JUDGE GARDEPHE

IN THE UNITED STATES DISTRICT COURT        14  CV        8927
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
VERNON JONES,

                                                                    JURY TRIAL DEMANDED

                    Plaintiff,

                                                                    COMPLAINT

                                                                    ECF CASE

          -against-

                                                                    INDEX NO.
THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY DEPARTMENT OF
CORRECTIONS ("NYCDOC") OFFICER
JOHN SMITH II, NYCDOC OFFICER
MASSEY, NYCDOC OFFICER
ADW MARGARITO, NYCDOC OFFICER                                       RECEIVED
CAPTAIN MORE, NYCDOC OFFICERS                                       NOV 1 0 2014
"JOHN DOES 1-5",                                                    U.S.D.C. S.D. N.Y.
                                                                    CASHIERS

                    Defendants.

-------------------------------------------------------------------X

          Plaintiff Vernon Jones, by his attorney, DAVID A. THOMPSON, complaining of

the defendants, respectfully alleges as follows:

## I.     PRELIMINARY STATEMENT

          1.     On August 1, 2014, the plaintiff was an inmate at Riker's Island

Correctional Facility. He was brutally attacked by defendant Corrections Officer John

Smith II and the other defendants herein. Having done nothing to provoke the attack, Mr.

Jones was nevertheless punched, slammed into walls, and pepper sprayed, leaving the

plaintiff with fractured bones, eye injuries, and other damages.

1

## II.    JURISDICTION

2.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

3.    Plaintiff Vernon Jones further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of action.

## III.   COMPLIANCE WITH GEN. MUN. LAW § 50-1

4.    A notice of claim was made and served upon the City of New York in compliance with section fifty-e of this chapter, and at least 30 days have elapsed since the service of such notice and adjustment or payment thereof has been neglected or refused, and this action or special proceeding is commenced within one year and ninety days after the happening of the events upon which the claim is based.

## IV.   VENUE

5.    Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b)(1) because the Defendant City of New York resides in this district.

## V.    JURY DEMAND

6.    Plaintiff respectfully demands a trial by jury for all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## VI.   THE PARTIES

7.    Plaintiff Vernon Jones is an African-American male. He is currently an inmate at Riker's Island.

2

8.    The City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York.

9.    Defendant THE CITY OF NEW YORK maintains the New York City Department of Corrections ("NYC DOC").

10.   The New York City Charter, Chapter 25, section 621, et seq., provides that the Commissioner of NYC DOC is responsible for the management of all institutions of the City in which prisoners are incarcerated either prior to or following trial.

11.   At all times relevant to this action, Defendant New York City Corrections Officer Smith II ("Defendant Corrections Officer Smith II") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his official duties.

12.   At all times relevant to this action, Defendant New York City Department of Corrections Officer Massey (badge number # 13653) ("Defendant Corrections Officer Massey") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his official duties.

13.   At all times relevant to this action, Defendant New York City Department of Corrections Officer ADW Margarito ("Defendant Corrections Officer ADW Margarito") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to her official duties.

14.   At all times relevant to this action, Defendant New York City Department of Corrections Officer Captain More (badge number 1364) ("Defendant Corrections Officer Captain More") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his official duties.

3

15. At all times hereinafter mentioned, the Defendants New York City Department of Corrections Officers "John Does 1-5" (together with the individually-named officers, "the Defendant Officers"), were corrections officers of NYC DOC and were acting under the supervision of said department and according to their official duties.

16. Plaintiff Vernon Jones will amend this complaint to name the Defendant Corrections Officers "John Does 1-5", as further information regarding their identifies become available to Plaintiff.

17. At all times relevant to this action, the Defendant Corrections Officers, either personally or through their employees, were acting under color of state law and/or pursuant to the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

18. Each and all of the acts of the Defendant Corrections Officers alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

19. All claims against all defendants other than Defendant THE CITY OF NEW YORK are asserted against said defendants in both their individual and official capacities.

## VII.   FACTS COMMON TO ALL CLAIMS

20. On August 1, 2014, at approximately 11:15 AM, Plaintiff Vernon Jones was being escorted to the law library of the AMKC facility along with approximately 5 other inmates by Defendant Corrections Officer Smith II.

4

21.     Plaintiff and other inmates expressed displeasure with the lack of water provided for them and being taken to the law library during their lunch break.

22.     Defendant Corrections Officer Smith II left this group in the care of another Corrections Officer while he went somewhere else.

23.     However, the other Corrections Officer to left the plaintiff's group, instructing the group to remain there and leaving them unattended.

24.     Defendant Corrections Officer ADW Margarito found the unsupervised group and took them to the corridor near Mod 11.

25.     Defendant Corrections Officer ADW Margarito stated that the correction officer that was supposed to have custody of the group would be written up.

26.     Defendant Corrections Officer ADW Margarito told the inmates to stand facing the wall, and went down the corridor.

27.     Defendant Correction Officer Smith II returned to where the group were standing.

28.     Defendant Correction Officer Smith II once again began to escort the group down the corridor.

29.     The group went through a gate into another corridor.

30.     Several of the inmates continued complaining about a lack of potable water.

31.     The plaintiff Vernon Jones complained to Defendant Correction Officer Smith II that it was unfair to take the plaintiff to the law library at mealtime, forcing him to choose between having a meal and doing necessary legal research.

5

32.     Defendant Correction Officer Smith II responded to Vernon Jones, in sum and substance, "I'll take you back for your mealtime." The plaintiff responded that he did not want to go back, because he needed to use the law library.

33.     Defendant Correction Officer Smith II responded, in sum and substance, "You're going to see," in a tone of voice that was threatening.

34.     Defendant Correction Officer Smith II allowed the rest of the group to enter the law library, but did not allow the plaintiff to enter.

35.     The plaintiff asked to speak to a supervisor.

36.     Ignoring him, Defendant Correction Officer Smith II took the plaintiff back in the direction from which they came, towards the gate.

37.     They encountered Defendant Corrections Officer ADW Margarito and Defendant Corrections Officer Captain More at the gate.

38.     Defendant Corrections Officer ADW Margarito spoke to Defendant Correction Officer Smith II, saying, in sum and substance, "Are you the gentleman who left the inmates unsupervised?"

39.     Defendant Correction Officer Smith II indicated that he was by nodding. The plaintiff also responded, saying, in sum and substance, "Yes it's him."

40.     Defendant Corrections Officer ADW Margarito told Defendant Correction Officer Smith II that he would be written up.

41.     A few moments later, without provocation or warning, Defendant Correction Officer Smith II punched the plaintiff in the face.

42.     The plaintiff did nothing to fight back.

6

43.     Defendant Correction Officer Smith II tackled the plaintiff and drove him into the wall.

44.     The plaintiff did nothing to fight back.

45.     Defendant Correction Officer Smith II began putting handcuffs on the plaintiff.

46.     The plaintiff did nothing to fight back.

47.     Other officers, upon information and belief including Defendant Correction Officer Massey and John Doe Corrections Officers 1-5, came to the scene.

48.     These officers joined Defendant Correction Officer Smith II in using force on the plaintiff.

49.     A corrections officer, upon information and belief Defendant Correction Officer Massey, sprayed the plaintiff with large amounts of pepper spray.

50.     The plaintiff was physically restrained by the cuffs and blinded by the pepper spray, lying on the floor.

51.     One or more of the Defendant Officers picked the plaintiff up off the floor by grabbing the plaintiff's fingers and the handcuffs. They pushed him into a wall.

52.     The Defendant Officers repeatedly said, in sum and substance, "Wait till we get you in the back."

53.     The Defendant Officers took the plaintiff into an intake area in the back of the facility.

54.     There, the Defendant Officers forced the plaintiff into a shower area.

55.     The plaintiff could not see. The Defendant Officers repeatedly pushed him into the wall.

7

56.     The Defendant Officers forced him to shower, even though the water washed more pepper spray into his eyes.

57.     The Defendant Officers kept him there a long time.

58.     Defendant Corrections Officer Captain More told the plaintiff that he could not go to the medical clinic for treatment of his injuries until he opened his eyes. Because of the pepper spray, however, opening his eyes was extremely painful.

59.     The plaintiff was taken to the clinic and placed in a cell that was filthy with urine. The plaintiff had been in the same clinic the night before, and witnessed an AIDS patient who was in that cell intentionally urinate all over the cell and its benches. The cell still smelled of urine. The plaintiff was afraid to sit down.

60.     It was a very long time before any medical staff saw the plaintiff.

61.     When a nurse saw the plaintiff, she refused to make notes of all his injuries, saying, in sum and substance, "We can only deal with two things at each visit."

62.     The plaintiff was referred to the urgent care facility.

63.     The plaintiff was again given inadequate medical treatment that failed to address all his injuries.

64.     Among the plaintiff's injuries were:

    a.    Broken left ring finger.

    b.    Broken left pinky.

    c.    Sprained left wrist/arm.

    d.    Damage to his vision in his left eye.

    e.    Severe pain and irritation from pepper spray to the eyes, ears, mouth, nose, and skin.

8

        f.     Injuries to the head, including symptoms indicative of a possible

concussion.

        g.     Injury to his ribs - left side.

        h.     Injury to his left knee.

        i.     Injury to his left lower back.

        j.     Injuries affecting nerve sensation in his right arm.

        k.     Psychological and emotional injuries.

        l.     Deprivation of sleep, food, water, medical care.

     65.     After the event, the plaintiff was falsely accused of, among other things, assault on an officer.

     66.     The plaintiff was punished by being placed in isolation.

     67.     As a result of the unconscionable treatment by the Defendant Officers, Plaintiff was caused to suffer personal injuries, violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

     68.     As a result of the Defendant Officers' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## VIII.  FACTS IN SUPPORT OF THE PLAINTIFF'S MONELL CLAIMS

     69.     In twenty-five years, there have been seven class actions on behalf of prisoners of the New York City Department of Corrections: *Nunez v. City of New York*, 11 Civ. 5845 (S.D.N.Y.) (use of excessive force in all New York City jails except the Eric M. Taylor Center ("EMTC") and the Elmhurst and Bellevue Prison Wards); *Amador, et al. v. Andrews, et al*. 03cv0650 (KTD) (S.D.N.Y.) (Challenges the sexual abuse-including forcible rape of women prisoners by state corrections officers throughout the

9

state); *Ingles v. Toro*, No. 01 Civ. 827 (S.D.N.Y.) (use of excessive force in all DOC jails); *Sheppard v. Phoenix*, No. 91 Civ. 4148; *Jackson v. Montemango*, No. 85 CV 2384 (E.D.N.Y.) (use of excessive force in Brooklyn House of Detention); *Reynolds v. Ward*, No. 81 Civ. 101 (S.D.N.Y.) (use of excessive force in Bellevue Prison Psychiatric Ward); *Fisher v. Koehler*, No. 83 Civ. 2128 (S.D.N.Y.) (use of excessive force in Correction Institution for Men, now known as Eric M. Taylor Center).

70.     The reason for so many lawsuits is that the NYC DOC has demonstrated a longstanding custom of toleration of, and willingness to reward, violence by its officers against inmates. For example, Mark Scott, a defendant in the Nunez case, was a security captain in the Central Punitive Segregation Unit (CPSU) in 1997, where he beat an inmate and tried to cover up the incident. He was suspended for 42 days, **but was then promoted to Assistant Chief of Security for the entire department**.

71.     Similar incidents -- such as attacks upon inmates that occur inside video blind spots -- occur system-wide. For example, Shameik Smallwood, a plaintiff in the Nunez case, was taken to a room with no video cameras in a headlock, handcuffed, and beaten by four staffers, while a captain looked on. He suffered a badly broken nose when required facial surgery.

72.     Members of the NYC DOC do not hesitate to use excessive force against inmates without justification.

73.     The NYC DOC Officers often remove inmates from their cell to isolated areas. Such areas are often search rooms or intake areas that lack video camera surveillance.

10

74.     Once off camera, NYC DOC Officers -- after assuring that no other
inmates or civilians are present as witnesses -- assault without care or regard for any
possible consequences; either for themselves, or for the inmates.

75.     Following these incidents, the officers routinely falsify documents and
render factually inaccurate reports to cover up for their unlawful conduct. Such
falsification takes the form of flat-out failing to report uses of force; under-reporting the
amount of force used, misrepresenting the availability of witnesses or the severity of the
injuries suffered by the inmate; or justifying the amount of force used by falsely claiming
that the inmate attacked the officer(s).

76.     Following these incidents, NYC DOC Officers often cause administrative
disciplinary proceedings to be brought against inmates whom the officers have assaulted.
These proceedings are brought in order to substantiate the officer(s)' false claims that the
inmate(s) attacked them. The NYC DOC often conducts these proceedings in an
unconstitutional manner, without affording the falsely-accused and injured inmate a
proper opportunity to tell what actually took place. Even when inmates testify their
stories are discredited based on the insistence by NYC DOC that the inmates' testimony
is inherently incredible simply because they are inmates.

77.     Such cases are numerous, as has been described in detail in the complaint
in Nunez v. City of New York. This complaint will recite only a few examples.

### THE ASSAULTS ON JAVON NEDD, CHRISTOPHER GRAHAM, AND AN UNKNOWN VICTIM AT QUEENS CRIMINAL COURT

78.     The recent case of Javon Nedd involved allegations nearly identical to
those at issue here, and involved one of the same officers: CO Maurice Lacey.

11

79.     On February 10, 2011, Mr. Nedd was being processed at the Queens
Criminal Court for a court appearance. Mr. Nedd was, like all inmates, required to pass
through a magnetometer area where there were no surveillance cameras. Defendant
Lacey and another officer, CO Stephen Lemon, punched Mr. Nedd without warning,
fracturing his left cheek. Mr. Nedd required emergency treatment at Jamaica Hosptial.
The officers covered up the attack by initiating false administrative charges against the
Mr. Nedd, which resulted in a long confinement in solitary.

80.     In the same unit, less than two hours later, another inmate was attacked by
corrections officers in the magnetometer area. Video shows portions of that attack
through an open door to the area. Although the incident was quite violent, the log for the
unit (which records the incident with Mr. Nedd) contained no record of the second
incident. The officers in charge of that unit covered up the second incident by failing to
report it.

81.     On September 14, 2011, Christopher Graham, like the Plaintiff in this case
and like Javon Nedd (discussed further below) was attacked without provocation by NYC
DOC officers at the Queens Criminal Court. Like both Javon Nedd and the Plaintiff in
this case, the assault on Mr. Graham began with the assaulting officer punching the
victim in the face without provocation or warning.

THE ASSAULTS ON DAPREE PETERSON AND JAMAL LIGHTFOOT

82.     The culture of violence by NYC DOC officers is illustrated by two recent
cases: the cases of Riker's Island inmates Dapree Peterson and Jamal Lightfoot.

83.     On December 3, 2012, Correction Officers Louis Pinto and Kevin Gilkes,
members of the NYC DOC transportation group, beat up prisoner Dapree Peterson, and

12

then filed false reports about the event, attempting to justify what occurred as a response
to the prisoner's aggression.

84.     In May 2012, CO Pinto and CO Gilkes were criminally charged with the
assault.

85.     When these officers were brought to trial, members of the NYC DOC
transportation group grounded all of the NYC DOC's buses on Riker's Island to prevent
victim Dapree Petersen from testifying against officers Gilkes and Pinto.  The DOC
officers' action paralyzed the criminal court system for more than one full day.

86.     The correction officers' action demonstrated that there is a widespread
belief among the DOC rank and file that assault on an inmate is acceptable conduct.

87.     Even high-ranking members of the NYC DOC approved of the stoppage
and the message it sent to the complaining victim.  According to multiple press reports,
Norman Seabrook, president of Corrections Officers Benevolent Association, encouraged
his members not to operate the buses.

88.     The City Department of Investigation placed Dapree Petersen under
special security and monitoring to prevent further retaliation against him.

89.     On July 11, 2012, NYCDOC officers assaulted Jamal Lightfoot in a search
room at George R. Vierno Center at Riker's Island.  Ten Department of Correction
employees were arrested and charged with multiple felonies in connection with a gang
assault of this inmate, and the subsequent coverup.

90.     Assistant Chief for Security Eliseo Perez, Jr.,46, and Captain Gerald
Vaughn, 46, while overseeing an institutional search of the jail, ordered members of the
Emergency Services Unit to assault Jamal Lightfoot in the intake area at the George R.

13

Vierno Center. Captain Michael Pollard, 40, and Correction Officers Alfred Rivera, 44, Tobias Parker, 43, Jose Parra, 44, and David Rodriguez, 38, carried out the order in a small search cell.

91.     The defendant officers falsified Use of Force Reports and Use of Force Witness Reports, claiming that the inmate, Lightfoot, had attacked CO Rivera before force was used to restrain Lightfoot.  CO Rivera later claimed that Lightfoot had slashed him with a sharpened piece of metal.  Captain Pollard was charged with tampering with physical evidence for producing what Correction Officers attempted to portray as Lightfoot's weapon only after the extent of the inmate's injuries became known.

## NYC DOC SUPERVISORS ESTABLISH CUSTOM OF TOLERANCE AND IMPUNITY OF ILLEGAL VIOLENCE AGAINST INMATES

92.     Supervisory staff for the NYC DOC are aware of the Department's pattern and practice of assaulting inmates without justification or cause. These individuals continue to not take any affirmative steps to curb or end this pattern and practice; thus, the illegal and unconstitutional assault of inmates continues.

93.     The NYC DOC uses one centralized Integrity and Policy Division (formerly called the Investigation Division). This Integrity and Policy Division investigates all reports of use of force by NYC DOC staff. The Integrity and Policy Division has the authority to decline to prosecute and to negotiate plea-bargains with NYC DOC employees.

94.     The NYC DOC is organized with a paramilitary chain of command, with the Department's central office consisting of the Commissioner, Chief of Department, and other top administrators. Whereas, NYC DOC Officers who are promoted are transferred to new commands within the Department jails following their promotion;

14

Officers who are known to have used unnecessary and excessive force in one command are often just transferred by the Department higher-ups to another command. Such Officers are transferred to facilities where they have similar contact with inmates, and continue assaulting and beating inmates in the same manner as their prior postings.

95.     Yet, NYC DOC supervisory staff does not discipline or terminate officers with demonstrably long histories of misconduct relating to excessive force against inmates. These officers are not transferred to non-contact positions.

96.     On July 17, 2013, the federal Department of Labor found that the New York City Department of Corrections lacked written policies regarding workplace violence.

97.     The NYC DOC Commissioner, Dora B. Schriro, Senior Deputy Commissioner, John J. Antonelli, and the Deputy Commissioner of Integrity and Policy, Florence Finkle are aware of the frequency, and severity of NYC DOC Officers' use of excessive and unjustified force against inmates, and are aware that NYC DOC inmates continue to be at risk of such brutal and unnecessary force.

98.     Commissioner Schriro, Senior Deputy Commissioner Antonelli, and Deputy Commissioner Finkle receive daily reports, documenting and compiling violent incidents within Department facilities. These "24" hour reports include incidents in which NYC DOC Officers use force against inmates, including brief summaries of such incidents.

99.     Specifically, Deputy Commissioner Finkle's Integrity and Policy Division systematically chose not to conduct meaningful investigations into uses of force by NYC DOC Officers.

15

100.    For years "24" hour reports have documented, and continue to document, the routine application of injurious force to inmates by staff members. The NYC DOC, by routine, fails to investigate these reports, and when an investigation does take place, applicable guidelines and procedures are ignored.

101.    These reports document frequent and numerous incidents in which NYC DOC Officers inflict severe and serious injuries upon inmates.

102.    More often than not, these investigations close by attributing the incident to some form of instigation by the inmate, such as falsely alleging that the inmate made a threatened or menaced the Officer who brutalized him or her.

103.    Another manner of closing these investigations based on fabrication and/or false reports by the NYC DOC Officers involves reporting that the incident occurred at an isolated area of the facility, where no cameras existed, and no witnesses were present.

104.    Often these investigations also contain incredible accounts by NYC DOC Officers that a single inmate attacked and assaulted multiple officers.

105.    The NYC DOC's improper conduct has continued for over thirty years, chronicled in multiple litigations in addition to the class actions mentioned above, including but not limited to:

♦       *Reynolds v. City of New York*, 11 Civ. 621 (S.D.N.Y.) (physical assault in GMDC resulting in shoulder fracture and loss of consciousness; settled for $200,500);

16

♦    *Mull v. City of New York*, 08 Civ. 8854 (S.D.N.Y.) (physical assault in AMKC resulting in diffuse axonal injury to brain, partial loss of sight and hearing; settled for $550,000);

♦    *Belvett v. City of New York*, 09 Civ. 8090 (S.D.N.Y.) (alleging physical assaults at GMDC and RNDC resulting in facial fracture; settled for $350,000);

♦    *Youngblood v. Baldwin*, 08 Civ. 5982 (S.D.N.Y.) (alleging physical assault at GRVC resulting in skull laceration and broken nose; settled for $240,000);

♦    *Williams v. City of New York*, 07 Civ. 11055 (S.D.N.Y.) (alleging physical assault in OBCC resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

♦    *Williams v. City of New York*, 09 Civ. 5734 (S.D.N.Y.) (alleging physical assault in RNDC resulting in laceration to head; settled for $87,500);

♦    *Lee v. Perez*, 09 Civ. 3134 (S.D.N.Y.) (alleging physical assault at NIC resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

♦    *Shuford v. City of New York*, 09 Civ. 945 (S.D.N.Y.) (alleging two physical assault at RNDC resulting in facial fractures; settled for $375,000);

17

♦    *Diaz v. City of New York*, 08 Civ. 4391 (S.D.N.Y.) (alleging

physical assault involving two inmates, one at AMKC and one at OBCC;

settled for a tital of $850,000);

♦    *Lugo v. City of New York*, 08 Civ. 2931 (S.D.N.Y.) (alleging

physical assault at NIC resulting in orbital fracture; settled for $185,000);

♦    *Cuadrado v. City of New York*, 07 Civ. 1447 (S.D.N.Y.) (alleging

physical assault at RNDC resulting in punctured lung; settled for

$175,000);

♦    *Scott v. City of New York*, 07 Civ. 3691 (S.D.N.Y.) (alleging

physical assault GMDC resulting in orbital fracture; settled for

$175,000);

♦    *Pischeottola v. City of New York*, 06 Civ. 2505 (S.D.N.Y.)

(alleging physical assault at RNDC resulting in punctured lung requiring

chest tube; settled for $150,000);

♦    Rice v. N.Y.C.D.O.C., 03 Civ. 582 (S.D.N.Y.) (alleging physical

assaults of two inmates at GRVC resulting in collapsed lung and

contusion hematomas, in one case, and in neck and spinal cord injuries

causing permanent stutter, in the other; settled for total of $845,000);

♦    *Joseph v. N.Y.C.D.O.C.*, 02 Civ. 9219 (S.D.N.Y.) (alleging

physical assault at GRVC resulting in orbital fracture; settled for

$375,000).

106.    Although, in settling the Ingles litigation, the NYC DOC agreed to

implement extensive changes in the customs and practices that resulted in the injuries to

18

the plaintiffs in that case, no discernable change has resulted. The NYC DOC continues to assault inmates. The NYC DOC continues to cover-up these assaults through fraudulent and incomplete investigations.

107.    Senior NYC DOC supervisors know of the continuous unlawful uses of brutality against inmates. Such notice is derived from the minimum of the multiple class actions lawsuits, and numerous other lawsuits, brought against the NYC DOC and its employees.

108.    In August, Preet Bharara, the United States attorney, released a scathing 79-page report on abuses at Rikers Island. This Complaint incorporates that report in its entirety by reference.

## FIRST CLAIM FOR RELIEF

## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

109.    The Plaintiff restates all allegations of this Complaint herein.

110.    Defendant The City of New York and its agents, including but not limited to the Defendant Officers (collectively, "Defendants") deprived Plaintiff of his rights guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution.

111.    All of the aforementioned acts of the Defendant THE CITY OF NEW YORK and its agents were carried out under the color of state law.

112.    The acts were carried out by the Defendant Officers in their capacities as officers of the NYC DOC.

113.    The acts were carried out by the Defendant Officers in their capacities as officers of the NYC DOC pursuant to the customs, usages, practices, procedures, and the rules of Defendant The City of New York and the NYC DOC, all under the supervision of ranking officers of said department.

114.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

115.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF

### CLAIMS UNDER NEW YORK STATE LAW

116.    The Plaintiff restates all allegations of this Complaint herein.

117.    Upon information and belief, the Plaintiff filed a notice of claim with the appropriate City authority, and more than 30 days passed and the City failed to satisfy the claim.

118.    The Plaintiff states claims against the Defendant Officers under state law for assault, battery, malicious prosecution, and negligence, seeking both compensatory and punitive damages.

119.    The Plaintiff states claims against the Defendant City of New York under state law for respondeat superior, negligence, and negligent hiring, training and supervision.

120.    Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

121.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF

### EXCESSIVE FORCE

122.    The Plaintiff restates all allegations of this Complaint herein.

123. While Plaintiff was in a corridor at Rikers' Island, Defendant Corrections Officer Smith II, Defendant Corrections Officer Massey, and New York City Department of Corrections Officers "John Does 1-5" used excessive force on the plaintiff.

124. At no point throughout their attack upon Plaintiff did the circumstances presented to the Defendant Officers support any of the above applications of force on Plaintiff.

125. As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

126. As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

127. The Plaintiff restates all allegations of this Complaint herein.

128. Defendant Corrections Officer ADW Margarito and Defendant Corrections Officer Captain More failed to adequately supervise and control the Defendant Officers that inflicted excessive force on the plaintiff.

129. The conduct of the Defendant Officers reflects that the City of New York failed to train these officers, and/or failed to supervise these officers to ensure that their training was followed.

130. As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

131. As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF

21

## MALICIOUS PROSECUTION

132.    The Plaintiff restates all allegations of this Complaint herein.

133.    At no point throughout their attack upon Plaintiff did the circumstances support any criminal or administrative charges against the Plaintiff.

134.    Nevertheless the Defendant Corrections Officers subjected the Plaintiff to false criminal or administrative charges, and initiated baseless criminal or administrative proceedings against the Plaintiff in violation of his civil rights under federal and state law.

135.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

136.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. §1983

137.    The Plaintiff restates all allegations of this Complaint herein.

138.    Defendant City of New York is responsible for the actions of its agents as alleged herein under the theory of respondeat superior pursuant to state law.

139.    Defendant City of New York is responsible for the actions of its agents as alleged herein because the Plaintiff's injuries were caused the agents of the City of New York acting in accordance with the policies, customs and practices of the City of New York.

140.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

22

141.    As a result of Defendants' conduct, Plaintiff demands judgment against
Defendants in a sum of money to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

142.    The Plaintiff restates all allegations of this Complaint herein.

143.    Each of the individual Defendant Correction Officers had an affirmative
duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

144.    In particular, Defendant Corrections Officer ADW Margarito and
Defendant Corrections Officer Captain More had the duty and power to intervene when
the lower-ranking Defendant Officers that attacked the plaintiff did so.

145.    Each of the individual Defendant Officers chose not to intervene on
Plaintiff's behalf to prevent the violation of his constitutional rights despite having had
realistic opportunities to do so.

146.    Each of the individual Defendant Officers chose not to intervene on
Plaintiff's behalf to prevent the violation of his constitutional rights despite having
substantially contributed to the circumstances within which the Plaintiff's rights were
violated by their affirmative conduct.

147.    As a result, Plaintiff suffered personal injuries, emotional distress, mental
anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

148.    As a result of Defendants' conduct, Plaintiff demands judgment against
Defendants in a sum of money to be determined at trial.

23

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court

assume jurisdiction and:

> [a] Invoke pendent party and pendent claim jurisdiction.
>
> [b] Award appropriate compensatory and punitive damages.
>
> [c] Empanel a jury.
>
> [d] Award attorney's fees and costs.
>
> [e] Award such other and further relief as the Court deems to be proper
> and in the interests of justice.

DATED:     New York, New York
           November 10, 2014

                                        Respectfully submitted,

                                        DAVID A. THOMPSON, ESQ. [DT 3091]
                                        Stecklow Cohen & Thompson
                                        217 Centre Street, 6th Floor
                                        New York, NY 10013
                                        Phone: (212) 566-8000
                                        Fax:   (212) 202-4952

24

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
VERNON JONES,

        Plaintiff,

                                              ECF CASE

-against-

                                              INDEX NO.

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY DEPARTMENT OF
CORRECTIONS ("NYCDOC") OFFICER
JOHN SMITH II, NYCDOC OFFICER
MASSEY, NYCDOC OFFICER
ADW MARGARITO, NYCDOC OFFICER
CAPTAIN MORE, NYCDOC OFFICERS
"JOHN DOES 1-5",

        Defendants.

---------------------------------------------------------------X

**COMPLAINT**

25