IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VERNON JONES,

                    Plaintiff,                    AMENDED
                                        COMPLAINT

                                        ECF CASE

          -against-                       INDEX NO. 14-cv-8927

THE CITY OF NEW YORK, a municipal entity,     Jury Trial Demanded
NEW YORK CITY DEPARTMENT OF
CORRECTIONS ("NYCDOC")
OFFICER SHAWN SMITH II, NYCDOC
OFFICER MASSEY, NYCDOC OFFICER
ADW MARGARITO, NYCDOC OFFICER
CAPTAIN ROSE MOORE, NYCDOC
OFFICERS "JOHN DOES" 1-5,

                    Defendants.

-----------------------------------------------------------X

      Plaintiff VERNON JONES, by his attorney, DAVID A. THOMPSON,

complaining of the defendants, respectfully alleges as follows:

I.      **PRELIMINARY STATEMENT**

      1.      On August 1, 2014, the plaintiff was an inmate at Riker's Island

Correctional Facility.  He was brutally attacked by defendant Corrections Officer Shawn

Smith II and the other defendants herein.  Having done nothing to provoke the attack, Mr.

Jones was nevertheless punched, slammed into walls, and pepper-sprayed, leaving the

plaintiff with fractured bones, eye injuries, and other damages.

II.     **JURISDICTION**

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4).

3.     Plaintiff Vernon Jones further invokes this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all state law claims and causes of action.

III.    **COMPLIANCE WITH GEN. MUN. LAW § 50-I**

4.     A notice of claim was made and served upon the City of New York in compliance with section fifty-e of this chapter, and at least 30 days elapsed since the service of such notice and adjustment or payment thereof has been neglected or refused, and this action or special proceeding is commenced within one year and ninety-days after the happening of the events upon which the claim is based.

IV.    **VENUE**

5.     Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. §1391(b)(1) because the Defendant City of New York resides in this district.

V.     **JURY DEMAND**

6.     Plaintiff respectfully demands a trial by jury for all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

VI.    **THE PARTIES**

7.     Plaintiff Vernon Jones is an African American male. He is currently an inmate at Riker's Island, located in Queens County, New York.

8.     The City of New York ("City") is a municipal corporation organized and existing under the laws of the State of New York.

9.     Defendant THE CITY OF NEW YORK maintains the New York City Department of Corrections ("NYC DOC").

10.     The New York City Charter, Chapter 25, section 621, et seq., provides that the Commissioner of NYC DOC is responsible for the management of all institutions of the City in which prisoners are incarcerated either prior to or following trial.

11.     At all times relevant to this action, Defendant New York City Corrections Officer Shawn Smith II ("Defendant Corrections Officer Smith") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his/her official duties.

12.     At all times relevant to this action, Defendant New York City Department of Corrections Officer Massey ("Defendant Corrections Officer Massey") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his/her official duties.

13.     At all times relevant to this action, Defendant New York City Department of Corrections Captain Rose Moore ("Defendant Corrections Captain Moore") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his/her official duties.

14.     At all times relevant to this action, Defendant New York City Department of Corrections Officer ADW Margarito ("Defendant Corrections Officer Margarito") was a corrections officer of NYC DOC and was acting under the supervision of said department and according to his/her official duties.

15.     At all times hereinafter mentioned, the Defendants New York City Department of Corrections Officers "John Does 1-5", (Collectively, along with Defendant Corrections Officer Smith, Defendant Corrections Officer Massey, Defendant Corrections Captain Moore, and Defendant Corrections Officer Margarito, "the Defendant Corrections Officers" or "the Individual Defendants") were corrections officers of NYC DOC and were acting under the supervision of said department and according to their official duties.

16.     Plaintiff Vernon Jones will amend this complaint to name the Defendant Corrections Officers "John Does 1-5", as further information regarding their identifies become available to Plaintiff.

17.     At all times relevant to this action, the Defendant Corrections Officers, either personally or through their employees, were acting under color of state law and/or pursuant to the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

18.     Each and all of the acts of the Defendant Corrections Officers alleged herein were done by said defendants while acting within the scope and in furtherance of their employment by Defendant THE CITY OF NEW YORK.

19.     All claims against all defendants other than Defendant THE CITY OF NEW YORK are asserted against said defendants in both their individual and official capacities.

**VII.    FACTS COMMON TO ALL CLAIMS**

20.     On August 1, 2014, at approximately 11:15 AM Plaintiff Vernon Jones was being escorted to the law library of the AMKC facility along with approximately 5 other inmates by Defendant Corrections Officer Smith.

21.     Plaintiff and the other inmates expressed displeasure with the lack of water provided for them, and because they were being taken to the library during their lunch break, requiring them to lose the opportunity to eat lunch.

22.     Defendant Corrections Officer Smith left this group in the case of another Corrections Officer while he went somewhere else.

23.     However, the other Corrections Officer also left the plaintiff's group, instructing the group to remain there, and leaving them unattended.

24.     Defendant Corrections Officer Margarito found the Unsupervised group and took them to the corridor near Mod 11.

25.     Defendant Corrections Officer Margarito told the inmates to stand facing the wall, and went down the corridor.

26.     Defendant Corrections Officer Smith returned to where the group were standing.

27.     Defendant Corrections Officer Smith once again began to escort the group down the corridor.

28.     The group went through a gate into another corridor.

29.     Several of the inmates continued complaining about a lack of potable water.

30.     The plaintiff Vernon Jones complained to Defendant Corrections Officer Smith that it was unfair to take the plaintiff to the law library at mealtime,.

31.    This was unfair to the plaintiff, because it forced him to choose between having a meal and doing necessary legal research.

32.    Defendant Corrections Officer Smith responded to Vernon Jones, in sum and substance, "I'll take you back to your mealtime." The plaintiff responded that he did not want to go back, because he needed to use the law library.

33.    Defendant Corrections Officer Smith responded, in sum and substance, "You're going to see," in a tone of voice that was threatening.

34.    Defendant Corrections Officer Smith allowed the rest of the group to enter the law library, but did not allow the plaintiff to enter.

35.    The plaintiff asked to speak to a supervisor.

36.    Ignoring him, Defendant Corrections Officer Smith took the plaintiff back in the direction from which they came, towards the gate.

37.    Defendant Corrections Officer Margarito spoke to Defendant Corrections Officer Smith, saying, in sum and substance, "Are you the gentleman who left the inmates unsupervised?"

38.    Defendant Corrections Officer Smith indicated that he was by nodding. The plaintiff also responded, saying, in sum and substance, "Yes it's him."

39.    Defendant Corrections Officer Margarito told Defendant Corrections Officer Smith that he would be written up.

40.    A few moments later, without provocation or warning, Defendant Corrections Officer Smith punched the plaintiff in the face.

41.    The plaintiff did nothing to fight back. Throughout the encounter, the plaintiff showed that he was obeying commands and would continue to obey commands.

42.     Defendant Corrections Officer Smith tackled the plaintiff and drove him into the wall.

43.     Defendant Corrections Officer Smith began putting handcuffs on the plaintiff.

44.     Other officers, upon information and belief including The plaintiff did nothing to fight back Defendant Corrections Officer Massey and Defendant Corrections Officers John Doe 1-5, came to the scene.

45.     These officers joined Defendant Corrections Officer Smith in using force on the plaintiff.

46.     A corrections officer, upon information and belief Defendant Corrections Officer Massey, sprayed the plaintiff with large amounts of pepper spray.

47.     The plaintiff was physically restrained by the cuffs and blinded by the pepper spray, lying on the floor.

48.     One or more of the Defendant Corrections Officers picked the plaintiff up off the floor by grabbing the plaintiff's fingers and the handcuffs. They pushed him into a wall.

49.     The Defendant Corrections Officers repeatedly said, in sum and substance, "Wait till we get you in the back."

50.     The Defendant Corrections Officers took the plaintiff into an intake area in the back of the facility. There, the Defendant Corrections Officer forced the plaintiff into a shower area.

51.     The plaintiff could not see. The Defendant Corrections Officers repeatedly pushed him into a wall.

52.     The Defendant Corrections Officers forced him to shower, even though the water washed more pepper spray into his eyes.

53.     The Defendant Corrections Officers kept him there a long time.

54.     Defendant Corrections Officer Moore told the plaintiff that he could not go to the medical clinic for treatment of his injuries until he opened his eyes.  Because of the pepper spray, however, opening his eyes was extremely painful.

55.     After a long time, the plaintiff was finally taken to the clinic and was placed in a cell that was filthy with urine.  The plaintiff had been in the same clinic the night before, and had witnessed an AIDS patient who was in that cell intentionally urinate over the cell and its benches.

56.     The cell still smelled of urine.  The plaintiff was afraid to sit down.

57.     When a nurse saw the plaintiff, she refused to make notes of all his injuries, saying, in sum and substance, "We can only deal with two things at each visit."

58.     The plaintiff was referred to the urgent care facility.

59.     The plaintiff was again given inadequate medical treatment that failed to address all his injuries.

60.     Among the injuries were:

     a.     Broken left ring finger.

     b.     Broken left pinky.

     c.     Sprained left wrist/arm.

     d.     Damage to his vision in his left eye.

     e.     Severe pain and irritation from pepper spray to the eyes, ears, mouth, nose and skin.

      f.     Injuries to the head, including symptoms indicative of a possible concussion.

      g.     Injury to his ribs, left side.

      h.     Injury to his left knee.

      i.     Injury to his left lower back

      j.     Injuries affecting nerve sensation in his right arm.

      k.     Psychological and emotional injuries.

      l.     Deprivation of sleep, food, water, medical care.

61.     After the event , the plaintiff was punished by being placed in isolation.

62.     As a result of the unconscionable treatment by the Defendant Corrections Officers, the plaintiff was caused to suffer personal injuries, violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

63.     As a result of the Defendant Corrections Officers' conduct, the plaintiff is entitled to a judgment against the defendants awarding damages in an amount to be determined at trial.

## VIII.  FACTS IN SUPPORT OF THE PLAINTIFF'S MONELL CLAIMS

64.     In twenty-five years, there have been seven class actions on behalf of prisoners of the New York City Department of Corrections:  *Nunez v. City of New York*, 11 Civ. 5845 (S.D.N.Y.) (use of excessive force in all New York City jails except the Eric M. Taylor Center ("EMTC") and the Elmhurst and Bellevue Prison Wards); *Amador, et al. v. Andrews, et al*. 03cv0650 (KTD) (S.D.N.Y.) (Challenges the sexual abuse-including forcible rape of women prisoners by state corrections officers throughout the

state); *Ingles v. Toro*, No. 01 Civ. 827 (S.D.N.Y.) (use of excessive force in all DOC jails); *Sheppard v. Phoenix*, No. 91 Civ. 4148; *Jackson v. Montemango*, No. 85 CV 2384 (E.D.N.Y.) (use of excessive force in Brooklyn House of Detention); *Reynolds v. Ward*, No. 81 Civ. 101 (S.D.N.Y.) (use of excessive force in Bellevue Prison Psychiatric Ward); *Fisher v. Koehler*, No. 83 Civ. 2128 (S.D.N.Y.) (use of excessive force in Correction Institution for Men, now known as Eric M. Taylor Center).

65.     The reason for so many lawsuits is that the NYC DOC has demonstrated a longstanding custom of toleration of, and willingness to reward, violence by its officers against inmates.  For example, Mark Scott, a defendant in the Nunez case, was a security captain in the Central Punitive Segregation Unit (CPSU) in 1997, where he beat an inmate and tried to cover up the incident. He was suspended for 42 days, **but was then promoted to Assistant Chief of Security for the entire department**.

66.      Similar incidents -- such as attacks upon inmates that occur inside video blind spots -- occur system-wide.  For example, Shameik Smallwood, a plaintiff in the Nunez case, was taken to a room with no video cameras in a headlock, handcuffed, and beaten by four staffers, while a captain looked on. He suffered a badly broken nose when required facial surgery.

67.     Members of the NYC DOC do not hesitate to use excessive force against inmates without justification.

68.     The NYC DOC Officers often remove inmates from their cell to isolated areas. Such areas are often search rooms or intake areas that lack video camera surveillance.

69.    Once off camera, NYC DOC Officers -- after assuring that no other inmates or civilians are present as witnesses -- assault without care or regard for any possible consequences; either for themselves, or for the inmates.

70.    Following these incidents, the officers routinely falsify documents and render factually inaccurate reports to cover up for their unlawful conduct. Such falsification takes the form of flat-out failing to report uses of force; under-reporting the amount of force used, misrepresenting the availability of witnesses or the severity of the injuries suffered by the inmate; or justifying the amount of force used by falsely claiming that the inmate attacked the officer(s).

71.    Following these incidents, NYC DOC Officers often cause administrative disciplinary proceedings to be brought against inmates whom the officers have assaulted. These proceedings are brought in order to substantiate the officer(s)' false claims that the inmate(s) attacked them. The NYC DOC often conducts these proceedings in an unconstitutional manner, without affording the falsely-accused and injured inmate a proper opportunity to tell what actually took place. Even when inmates testify their stories are discredited based on the insistence by NYC DOC that the inmates' testimony is inherently incredible simply because they are inmates.

72.    Such cases are numerous, as has been described in detail in the complaint in Nunez v. City of New York.  This complaint will recite only a few examples.

### THE ASSAULTS ON JAVON NEDD, CHRISTOPHER GRAHAM, AND AN UNKNOWN VICTIM AT QUEENS CRIMINAL COURT

73.    The recent case of Javon Nedd involved allegations nearly identical to those at issue here, and involved one of the same officers: CO Maurice Lacey.

74.     On February 10, 2011, Mr. Nedd was being processed at the Queens Criminal Court for a court appearance. Mr. Nedd was, like all inmates, required to pass through a magnetometer area where there were no surveillance cameras. Defendant Lacey and another officer, CO Stephen Lemon, punched Mr. Nedd without warning, fracturing his left cheek. Mr. Nedd required emergency treatment at Jamaica Hosptial. The officers covered up the attack by initiating false administrative charges against the Mr. Nedd, which resulted in a long confinement in solitary.

75.     In the same unit, less than two hours later, another inmate was attacked by corrections officers in the magnetometer area. Video shows portions of that attack through an open door to the area. Although the incident was quite violent, the log for the unit (which records the incident with Mr. Nedd) contained no record of the second incident. The officers in charge of that unit covered up the second incident by failing to report it.

76.     On September 14, 2011, Christopher Graham, like the Plaintiff in this case and like Javon Nedd (discussed further below) was attacked without provocation by NYC DOC officers at the Queens Criminal Court. Like both Javon Nedd and the Plaintiff in this case, the assault on Mr. Graham began with the assaulting officer punching the victim in the face without provocation or warning.

<u>THE ASSAULTS ON DAPREE PETERSON AND JAMAL LIGHTFOOT</u>

77.     The culture of violence by NYC DOC officers is illustrated by two recent cases: the cases of Riker's Island inmates Dapree Peterson and Jamal Lightfoot.

78.     On December 3, 2012, Correction Officers Louis Pinto and Kevin Gilkes, members of the NYC DOC transportation group, beat up prisoner Dapree Peterson, and

12

then filed false reports about the event, attempting to justify what occurred as a response to the prisoner's aggression.

79.     In May 2012, CO Pinto and CO Gilkes were criminally charged with the assault.

80.     When these officers were brought to trial, members of the NYC DOC transportation group grounded all of the NYC DOC's buses on Riker's Island to prevent victim Dapree Petersen from testifying against officers Gilkes and Pinto. The DOC officers' action paralyzed the criminal court system for more than one full day.

81.     The correction officers' action demonstrated that there is a widespread belief among the DOC rank and file that assault on an inmate is acceptable conduct.

82.     Even high-ranking members of the NYC DOC approved of the stoppage and the message it sent to the complaining victim. According to multiple press reports, Norman Seabrook, president of Corrections Officers Benevolent Association, encouraged his members not to operate the buses.

83.     The City Department of Investigation placed Dapree Petersen under special security and monitoring to prevent further retaliation against him.

84.     On July 11, 2012, NYCDOC officers assaulted Jamal Lightfoot in a search room at George R. Vierno Center at Riker's Island. Ten Department of Correction employees were arrested and charged with multiple felonies in connection with a gang assault of this inmate, and the subsequent coverup.

85.     Assistant Chief for Security Eliseo Perez, Jr.,46, and Captain Gerald Vaughn, 46, while overseeing an institutional search of the jail, ordered members of the Emergency Services Unit to assault Jamal Lightfoot in the intake area at the George R.

Vierno Center. Captain Michael Pollard, 40, and Correction Officers Alfred Rivera, 44, Tobias Parker, 43, Jose Parra, 44, and David Rodriguez, 38, carried out the order in a small search cell.

86.     The defendant officers falsified Use of Force Reports and Use of Force Witness Reports, claiming that the inmate, Lightfoot, had attacked CO Rivera before force was used to restrain Lightfoot. CO Rivera later claimed that Lightfoot had slashed him with a sharpened piece of metal. Captain Pollard was charged with tampering with physical evidence for producing what Correction Officers attempted to portray as Lightfoot's weapon only after the extent of the inmate's injuries became known.

### NYC DOC SUPERVISORS ESTABLISH CUSTOM OF TOLERANCE AND IMPUNITY OF ILLEGAL VIOLENCE AGAINST INMATES

87.     Supervisory staff for the NYC DOC are aware of the Department's pattern and practice of assaulting inmates without justification or cause. These individuals continue to not take any affirmative steps to curb or end this pattern and practice; thus, the illegal and unconstitutional assault of inmates continues.

88.     The NYC DOC uses one centralized Integrity and Policy Division (formerly called the Investigation Division). This Integrity and Policy Division investigates all reports of use of force by NYC DOC staff. The Integrity and Policy Division has the authority to decline to prosecute and to negotiate plea-bargains with NYC DOC employees.

89.     The NYC DOC is organized with a paramilitary chain of command, with the Department's central office consisting of the Commissioner, Chief of Department, and other top administrators. Whereas, NYC DOC Officers who are promoted are transferred to new commands within the Department jails following their promotion;

Officers who are known to have used unnecessary and excessive force in one command are often just transferred by the Department higher-ups to another command. Such Officers are transferred to facilities where they have similar contact with inmates, and continue assaulting and beating inmates in the same manner as their prior postings.

90.     Yet, NYC DOC supervisory staff does not discipline or terminate officers with demonstrably long histories of misconduct relating to excessive force against inmates. These officers are not transferred to non-contact positions.

91.     On July 17, 2013, the federal Department of Labor found that the New York City Department of Corrections lacked written policies regarding workplace violence.

92.     The NYC DOC Commissioner, Dora B. Schriro, Senior Deputy Commissioner, John J. Antonelli, and the Deputy Commissioner of Integrity and Policy, Florence Finkle are aware of the frequency, and severity of NYC DOC Officers' use of excessive and unjustified force against inmates, and are aware that NYC DOC inmates continue to be at risk of such brutal and unnecessary force.

93.     Commissioner Schriro, Senior Deputy Commissioner Antonelli, and Deputy Commissioner Finkle receive daily reports, documenting and compiling violent incidents within Department facilities. These "24" hour reports include incidents in which NYC DOC Officers use force against inmates, including brief summaries of such incidents.

94.     Specifically, Deputy Commissioner Finkle's Integrity and Policy Division systematically chose not to conduct meaningful investigations into uses of force by NYC DOC Officers.

95.     For years "24" hour reports have documented, and continue to document, the routine application of injurious force to inmates by staff members. The NYC DOC, by routine, fails to investigate these reports, and when an investigation does take place, applicable guidelines and procedures are ignored.

96.     These reports document frequent and numerous incidents in which NYC DOC Officers inflict severe and serious injuries upon inmates.

97.     More often than not, these investigations close by attributing the incident to some form of instigation by the inmate, such as falsely alleging that the inmate made a threatened or menaced the Officer who brutalized him or her.

98.     Another manner of closing these investigations based on fabrication and/or false reports by the NYC DOC Officers involves reporting that the incident occurred at an isolated area of the facility, where no cameras existed, and no witnesses were present.

99.     Often these investigations also contain incredible accounts by NYC DOC Officers that a single inmate attacked and assaulted multiple officers.

100.     The NYC DOC's improper conduct has continued for over thirty years, chronicled in multiple litigations in addition to the class actions mentioned above, including but not limited to:

> ◆     *Reynolds v. City of New York*, 11 Civ. 621 (S.D.N.Y.) (physical assault in GMDC resulting in shoulder fracture and loss of consciousness; settled for $200,500);

- ◆    *Mull v. City of New York*, 08 Civ. 8854 (S.D.N.Y.) (physical assault in AMKC resulting in diffuse axonal injury to brain, partial loss of sight and hearing; settled for $550,000);

- ◆    *Belvett v. City of New York*, 09 Civ. 8090 (S.D.N.Y.) (alleging physical assaults at GMDC and RNDC resulting in facial fracture; settled for $350,000);

- ◆    *Youngblood v. Baldwin*, 08 Civ. 5982 (S.D.N.Y.) (alleging physical assault at GRVC resulting in skull laceration and broken nose; settled for $240,000);

- ◆    *Williams v. City of New York*, 07 Civ. 11055 (S.D.N.Y.) (alleging physical assault in OBCC resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

- ◆    *Williams v. City of New York*, 09 Civ. 5734 (S.D.N.Y.) (alleging physical assault in RNDC resulting in laceration to head; settled for $87,500);

- ◆    *Lee v. Perez*, 09 Civ. 3134 (S.D.N.Y.) (alleging physical assault at NIC resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

- ◆    *Shuford v. City of New York*, 09 Civ. 945 (S.D.N.Y.) (alleging two physical assault at RNDC resulting in facial fractures; settled for $375,000);

◆       *Diaz v. City of New York*, 08 Civ. 4391 (S.D.N.Y.) (alleging

physical assault involving two inmates, one at AMKC and one at OBCC;

settled for a tital of $850,000);

◆       *Lugo v. City of New York*, 08 Civ. 2931 (S.D.N.Y.) (alleging

physical assault at NIC resulting in orbital fracture; settled for $185,000);

◆       *Cuadrado v. City of New York*, 07 Civ. 1447 (S.D.N.Y.) (alleging

physical assault at RNDC resulting in punctured lung; settled for

$175,000);

◆       *Scott v. City of New York*, 07 Civ. 3691 (S.D.N.Y.) (alleging

physical assault GMDC resulting in orbital fracture; settled for

$175,000);

◆       *Pischeottola v. City of New York*, 06 Civ. 2505 (S.D.N.Y.)

(alleging physical assault at RNDC resulting in punctured lung requiring

chest tube; settled for $150,000);

◆       *Rice v. N.Y.C.D.O.C.*, 03 Civ. 582 (S.D.N.Y.) (alleging physical

assaults of two inmates at GRVC resulting in collapsed lung and

contusion hematomas, in one case, and in neck and spinal cord injuries

causing permanent stutter, in the other; settled for total of $845,000);

◆       *Joseph v. N.Y.C.D.O.C.*, 02 Civ. 9219 (S.D.N.Y.) (alleging

physical assault at GRVC resulting in orbital fracture; settled for

$375,000).

101.    Although, in settling the <u>Ingles</u> litigation, the NYC DOC agreed to

implement extensive changes in the customs and practices that resulted in the injuries to

the plaintiffs in that case, no discernable change has resulted. The NYC DOC continues to assault inmates. The NYC DOC continues to cover-up these assaults through fraudulent and incomplete investigations.

102.    Senior NYC DOC supervisors know of the continuous unlawful uses of brutality against inmates. Such notice is derived from the minimum of the multiple class actions lawsuits, and numerous other lawsuits, brought against the NYC DOC and its employees.

103.    In August 2014, Preet Bhara, the United States Attorney representing the federal government in the this district, issued a scathing 79-page report on abuses at Riker's Island.  This Complaint incorporates that report in its entirety by reference.

### FIRST CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

104.    The Plaintiff restates all allegations of this Complaint herein.

105.    Defendant The City of New York and its agents, including but not limited to the Defendant Corrections Officers (collectively, "Defendants") deprived Plaintiff of his rights guaranteed by the Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution.

106.    All of the aforementioned acts of the Defendants were carried out under the color of state law.

107.    The acts were carried out by the Defendant Corrections Officers in their capacities as officers of the NYC DOC.

108.    The acts were carried out by the Defendant Corrections Officers in their capacities as officers of the NYC DOC pursuant to the customs, usages, practices,

procedures, and the rules of Defendant The City of New York and the NYC DOC, all
under the supervision of ranking officers of said department.

109.    As a result, Plaintiff suffered personal injuries, emotional distress, mental
anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

110.    As a result of Defendants' conduct, Plaintiff demands judgment against
Defendants in a sum of money to be determined at trial.

## SECOND CLAIM FOR RELIEF

## CLAIMS UNDER NEW YORK STATE LAW

111.    The Plaintiff restates all allegations of this Complaint herein.

112.    Upon information and belief, the Plaintiff filed a notice of claim with the
appropriate City authority, and more than 30 days passed and the City failed to satisfy the
claim.

113.    The Plaintiff states claims against the Defendant Corrections Officers
under state law for assault, battery, malicious prosecution, and negligence, seeking both
compensatory and punitive damages.

114.    The Plaintiff states claims against the Defendant City of New York under
state law for respondeat superior, negligence, and negligent hiring, training and
supervision.

115.    Plaintiff suffered personal injuries, emotional distress, mental anguish,
anxiety, fear, humiliation, and other irreparable damage to his life.

116.    As a result of Defendants' conduct, Plaintiff demands judgment against
Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF

## EXCESSIVE FORCE

20

117.    The Plaintiff restates all allegations of this Complaint herein.

118.    While the plaintiff was in a corridor at Rikers' Island, Defendant Corrections Officers Smith, Massey, and Defendant Corrections Officers John Doe 1-5 used excessive force on the plaintiff.

119.    At no point throughout their attack upon Plaintiff did the circumstances presented to the Defendant Corrections Officers support any of the above applications of force on Plaintiff.

120.    Plaintiff was subjected to excessive force and was assaulted by the Defendant Corrections Officers, in violation of his civil rights under federal law, and in violation of state law.

121.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

122.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

123.    The Plaintiff restates all allegations of this Complaint herein.

124.    Defendant Corrections Officers Moore and Margarito failed to adequately supervise and control the Defendant Corrections Officers that inflicted excessive force on the plaintiff.

125.    The conduct of these Defendant Corrections Officer reflects that the City of New York failed to train these officers, and/or failed to supervise these officers to ensure that their training was followed.

126.   The City of New York and the individual Defendant Corrections Officers who were in a supervisory position to do so, negligently failed to effectively train or supervise the other individual Defendant Corrections Officers who failed to intervene in the assault on the Plaintiff, and/or who participated in or condoned the bringing of false criminal and administrative charges against the Plaintiff.

127.   As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

128.   As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF

## MALICIOUS PROSECUTION

129.   The Plaintiff restates all allegations of this Complaint herein.

130.   At no point throughout their attack upon the plaintiff did the circumstances support any criminal or administrative charges against the plaintiff.

131.   Nevertheless, the Defendant Corrections Officers subjected the plaintiff to false criminal and administrative charges, and initiates baseless criminal or administrative proceedings against the plaintiff in violation of his civil rights under federal and state law.

132.   Nevertheless, the Defendant Corrections Officers subjected the plaintiff to administrative punishment, including solitary confinement, without factual or legal basis and without due process.

133.   At no point throughout their attack upon Plaintiff did the circumstances support any criminal or administrative charges against the Plaintiff.

134.   The Plaintiff was cleared of all criminal charges.

135.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

136.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF

### MUNICIPAL LIABILITY
### UNDER *RESPONDEAT SUPERIOR*

137.    The Plaintiff restates all allegations of this Complaint herein.

138.    Defendant City of New York is responsible for the actions of its agents as alleged herein under the theory of respondeat superior pursuant to state law.

139.    Defendant City of New York is responsible for the actions of its agents as alleged herein because the Plaintiff's injuries were caused the agents of the City of New York acting in accordance with the policies, customs and practices of the City of New York.

140.    Defendant City of New York is responsible for the actions of its agents as alleged herein because the Plaintiff's injuries were caused the agents of the City of New York acting within the scope of their employment.

141.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

142.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SEVENTH CLAIM FOR RELIEF

### MUNICIPAL LIABILITY
### UNDER *MONELL*

143.    The Plaintiff restates all allegations of this Complaint herein.

23

144.    Defendant City of New York is liable to the defendant because his injuries were caused as a result of a policies, practices, and customs established by the City of New York and the New York City Department of Corrections.

145.    Defendant City of New York is liable to the defendant because his injuries were caused as a result of a policies, practices, and customs known to, and tolerated by, the City of New York and the New York City Department of Corrections, even though the City knew that these policies, practices, and customs were likely to result in violations of Constitutional Rights like those that caused the plaintiff's injuries.

146.    As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

147.    As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

148.    The Plaintiff restates all allegations of this Complaint herein.

149.    Each of the individual Defendant Correction Officers had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights.

150.    Each of the individual Defendant Correction Officers chose not to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having had realistic opportunities to do so.

151.    Each of the individual Defendant Correction Officers chose not to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which the Plaintiff's rights were violated by their affirmative conduct.

152.   As a result, Plaintiff suffered personal injuries, emotional distress, mental anguish, anxiety, fear, humiliation, and other irreparable damage to his life.

153.   As a result of Defendants' conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Empanel a jury.

[d] Award attorney's fees and costs.

[e] Award such other and further relief as the Court deems to be proper and in the interests of justice.

DATED:      New York, New York
            April 23, 2015

Respectfully submitted,

DAVID A. THOMPSON, ESQ. [DT 3991]
The Law Office of Wylie Stecklow
10 SPRING STREET – SUITE 1
New York, New York 10012
[212] 566-8000
[212] 202-4952/FAX
ATTORNEY FOR PLAINTIFF